## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **WILLIAM MADDEN**, individually and on behalf of all others similarly situated, <br><br>     Plaintiff, <br><br> v. <br><br> **RADIUS GLOBAL SOLUTIONS LLC**, <br><br>     Defendant. | Case No. <br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

William Madden ("Plaintiff"), brings this Class Action Complaint against Radius Global Solutions LLC ("Defendant" or "Radius"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This lawsuit seeks to redress the harms caused by Radius' massive and preventable data breach perpetrated by well-known cybergang, Cl0p ("Clop"). During the data breach Clop infiltrated the inadequately protected MOVEit software Radius negligently used and stole the highly sensitive and confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") of Plaintiff and 600,794 other similarly situated individuals (the "Class" or

"Class Members").[1] Due to Radius' failure to utilize software with adequate data security measures in place, Plaintiff and the Class face a lifetime risk of fraud and identity theft.

2.    Defendant is a business services company based in Edina, Minnesota.[2] Radius specializes in accounts receivable and customer relations management solutions, such as data collections services, customer service outsourcing, delinquency management and sales and market research.[3] Radius Global Solutions employs more than 4,000 people and generates approximately $845 million in annual revenue. [4]

3.    On August 4, 2023, Defendant announced "a recent event involving the MOVEit web transfer application that may impact the privacy of your information" (the "Data Breach" or "Breach"). [5]

4.    Radius divulged that on or around June 1, 2023, Radius became aware of a vulnerability in the MOVEit web transfer application it utilizes for transferring documents.[6]

---

[1] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (Radius Global Solutions LLC).

[2] https://www.jdsupra.com/legalnews/radius-global-solutions-reports-data-3180890/.

[3] https://www.jdsupra.com/legalnews/radius-global-solutions-reports-data-3180890/.

[4] *See*   https://www.radiusgs.com/about-us/ (last visited: August 22, 2023); *see also* https://www.jdsupra.com/legalnews/radius-global-solutions-reports-data-3180890/.

[5] Defendant eventually reported a data breach to the U.S. Department of Health and Human Services           Office           for           Civil           Rights           at https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf;jsessionid=41E40787B067C62FF1 35335C9848B869

[6] *See* **Exhibit 1**

5.      According to Radius, it investigated its MOVEit database to assess its security and to identify any documents that may have been accessed by unauthorized actors.[7]

6.      Radius admits that the information compromised in the Data Breach included PII and PHI such as: names, dates of birth, Social Security numbers, patient treatment codes, treatment locations, and treatment payment history (including health insurance providers).

7.      Despite learning of the Data Breach a month earlier, Defendant sent a notice of data event letter ("Notice of Data Breach") to victims on or around August 9, 2023.[8] Thus, cybercriminals were given a head start in misusing Plaintiff's and the Class's PII/PHI before they were even informed of what happened.

8.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

9.      This Complaint is brought against Defendant because of its failure to safeguard the Private Information entrusted to it, and to remedy the harms suffered by Plaintiff and all others similarly situated.

10.      Plaintiff and Class Members have suffered injuries as a result of the

---

[7] *Id.*

[8] *Id.*

Defendant's negligent conduct, including: (i) the potential for Plaintiff's and Class Members' exposed Private Information to be sold and distributed on the dark web (if it has not been already), (ii) a lifetime risk of identity theft, sharing, and detrimental use of their sensitive information, (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information, (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and (v) the continued and increased risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to take appropriate and adequate measures to protect its customers' Private Information.

11.    Plaintiff and Class Members have a continuing interest in ensuring that their Private Information is and remains safe, and they are entitled to equitable and injunctive relief.

## **PARTIES**

12.    Plaintiff **William Madden** is a citizen of El Paso, Texas. Plaintiff Madden received a Notice of Data Breach Letter from Defendant around August 14, 2023.

13.    Defendant **Radius Global Solutions LLC** is a Minnesota limited liability company headquartered at 7831 Glenroy, Suite 250, Edina, Minnesota 55439.

## **JURISDICTION AND VENUE**

14.    This Court has diversity jurisdiction over this action under the Class Action Fairness Act ("CAFA") and 28 U.S.C. § 1332(d) because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of

interest and costs, and many members of the class are citizens of states different from Defendant.

15.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District, and it regularly transacts business in this District.

16.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because the District of Minnesota is a judicial district in which a substantial part of the events giving rise to the claim occurred. Further, venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because Defendant resides in Minnesota.

## FACTUAL ALLEGATIONS

### A.    Background

17.    On or around June 1, 2023, Defendant "learned of a vulnerability in the MOVEit web transfer application that Radius…utilizes for transferring documents." [9] The MOVEit software is produced by Progress Software Corporation ("PSC").

18.    After an investigation of its MOVEit database, Defendant's only conclusion was that "some documents were accessed" and it was unable to provide victims any information regarding when the unauthorized actor had access to its MOVEit database.[10]

19.    On or about August 9, 2023, Defendant sent victims of the Data Breach a Notice of Data Breach Letter. *See* **Exhibit 1**. Plaintiff's Notice of Data Breach Letter, in pertinent part, states the following:

**What Happened?** On June 1, 2023, Radius learned of a vulnerability in the

---

[9] *See* **Exhibit 1**.

[10] *Id.*

MOVEit web transfer application that Radius, along with several thousand other companies and government agencies, utilizes for transferring documents. Upon learning cybercriminals exploited the vulnerability, Radius immediately investigated its MOVEit database to assess its security and to identify any documents that may have been accessed by unauthorized actors. After determining some documents were accessed, Radius conducted a comprehensive review of the impacted files to determine what information was present in the impacted files, to whom the information related, and contact information for applicable individuals. Radius then worked with its clients to notify individuals whose information was present in the files accessible to the unauthorized actors due to the MOVEit vulnerability exploitation.

20.    Defendant's Notice of Data Breach admits that Plaintiff's and Class Members' Private Information was accessed by cybercriminals without authorization.

21.    Cl0p accessed and acquired files in Defendant's computer systems containing the unencrypted PII/PHI of Plaintiff and Class Members.

22.    In the ordinary course of serving its clients, Defendant stores, maintains, and uses Plaintiff's and Class Members' Private Information.

23.    Defendant utilized the file transfer service, MOVEit, as a web transfer application to transfer documents. Defendant utilized the software with complete disregard for its data security and infrastructure.

24.    Defendant agreed to and undertook legal duties to maintain the Private Information of Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws. Defendant had obligations created by the FTC Act, HIPAA, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

25.    Defendant knew of its duties to Plaintiff and the Class Members, and the

risks associated with failing to protect the Private Information entrusted to it. Defendant knew that if it did not select a vendor/software with adequate security that Plaintiff's and the Class's Private Information would be unlawfully exposed.

26.     Upon information and belief, Defendant failed to properly inquire about MOVEit's data security before entrusting the software with Plaintiff's and the Class's Private Information and failed to monitor and oversee MOVEit's data security throughout its use of the software. Had Defendant properly inquired about MOVEit's data security, oversaw MOVEit's data security, and monitored MOVEit's data security, Plaintiff's and the Class's Private Information would have never been exposed in the Data Breach.

27.     Defendant had notice of the Data Breach by at least June 1, 2023. Yet, Defendant delayed informing Plaintiff and the Class of the Breach until in or around August. On August 9, 2023, Defendant finally began sending Plaintiff and Class Members Notice of the Data Breach.

28.     The unencrypted Private Information of Plaintiff and Class Members will likely or already is for sale on the dark web, and may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can already access the Private Information of Plaintiff and Class Members.[11] [12]

---

[11] Clop cyber gang claims MOVEit attack and starts harassing victims (June 7, 2023), available at https://www.computerweekly.com/news/366539357/Clop-cyber-gang-claims-MOVEit-attack-and-starts-harassing-victims.

[12] Clop names a dozen MOVEit victims, but holds back details (June 15, 2023), available at https://www.cybersecuritydive.com/news/clop-moveit-data-leaks-victims-

29.    Defendant was negligent and did not use or implement reasonable security procedures, oversight, and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiff and Class Members, causing the exposure of PII for Plaintiff and Class Members.

30.    Defendant was also negligent in that it did not use software with adequate data security. Defendant should have inquired about MOVEit's data security prior to handing over Plaintiff's and the Class's PII and PHI.

31.    Because Defendant had a duty to protect Plaintiff's and Class Members' Private Information, Defendant should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

32.    In October 2019, the Federal Bureau of Investigation published an article online titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[13]

33.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned

---

named/653131/
[13] FBI, High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations (Oct.    2,    2019)    (emphasis    added),    available    at https://www.ic3.gov/Media/Y2019/PSA191002 (last viewed Aug. 23, 2023).

in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[14]

34.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[15]

35.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting big companies such as Defendant and Defendant's clients, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendant and Defendant's clients, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

---

[14] 8 5 ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited Aug. 23, 2023).

[15] U.S. CISA, Ransomware Guide – September 2020, available at https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf (last visited Aug. 23, 2023).

36.    Considering the information readily available and accessible on the internet before the Data Breach and Defendant's involvement in data breach litigation, Defendant, having elected to store the unencrypted Private Information of Plaintiff and Class Members with a third-party without first ensuring that the third party's system was secure, had reason to know that Plaintiff and the Class Members' Private Information was at risk for being shared with unknown and unauthorized persons.

37.    Prior to the Data Breach, Defendant knew or should have known that it was responsible for confirming that MOVEit's systems were secure and capable of protecting Plaintiff's and the Class Members' Private Information.

38.    Since the breach, Defendant continues to store confidential information, including Plaintiff's and Class Members' Private Information and has failed to give adequate assurances that it has enhanced its security practices sufficiently to avoid another breach in the future.

### *Plaintiff William Madden's Experience*

39.    Upon information and belief, Radius acquired Plaintiff Madden's Private Information while providing debt collection services for Mr. Madden's unpaid hospital bill.

40.    Defendant acquired, collected, and stored Plaintiff's Private Information and negligently used the MOVEit software to transfer files containing Plaintiff's PII/PHI. Defendant was in possession of Plaintiff's Private Information before, during, and after the Data Breach.

41.    Defendant was obligated by law, regulations, and guidelines to protect Plaintiff's and the Class's Private Information and Defendant was required to ensure the

MOVEit software was adequately protected with data security and infrastructure to protect Plaintiff's and the Class's Private Information.

42.     Plaintiff received the Notice of Data Breach in or around August 14, 2023. The Notice stated that the information exposed in the breach included Plaintiff's and the Class's names, dates of birth, Social Security numbers, treatment codes, treatment locations, and treatment payment history (including health insurance providers). Now, for the rest of his life, Plaintiff is at a significant risk of identity theft and fraud.

43.     As a result of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring his accounts, and cancelling accounts containing his PII. This time has been lost forever and cannot be recaptured.

44.     Additionally, Plaintiff is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

45.     Plaintiff stores any documents containing his sensitive Private Information in safe and secure locations or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

46.     As a direct and traceable result of the Data Breach, Plaintiff suffered actual damages such as: (i) lost time related to monitoring his accounts for fraudulent activity; (ii) loss of privacy due to his Private Information being exposed to cybercriminals; (iii) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (iv) severe emotional distress because identity thieves now possess his Private

Information; (v) exposure to increased and imminent risk of fraud and identity theft now that his Private Information has been exposed; (vi) the loss in value of his Private Information due to his Private Information being in the hands of cybercriminals who can use it at their leisure; (vii) actual misuse of his Private Information; and (viii) other economic and non-economic harm.

47. Plaintiff has also experienced actual misuse of his Private Information. After the breach, Plaintiff experienced a significant increase in spam text messages and emails. Further, since the breach, he has experienced unauthorized attempts to make fraudulent purchases through his CashApp account.

48. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and criminals.

49. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**B.    Cyber Criminals Will Use Plaintiff's PII and PHI to Defraud Him**

50. PII and PHI are of great value to hackers and cyber criminals, and the data stolen in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiff and the Class Members to profit off their misfortune.

51.     Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[16] For example, with the Private Information stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[17] These criminal activities have and will result in devastating financial and personal losses to Plaintiff Madden and the Class Members.

52.     Social security numbers are particularly sensitive pieces of personal information.  As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[18]

---

[16] "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[17] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 15, 2017, https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/

[18] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

(Emphasis added.)

53.    PII and PHI are such valuable commodities to identity thieves that once this information has been compromised, criminals will use it for years.[19]

54.    This was a financially motivated Breach, as the only reason the cyber criminals go through the trouble of running a targeted cyberattack is to get information that they can monetize by selling it on the black market for use in the kinds of criminal activity described herein.  Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[20] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[21]

55.    These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, they **will** use it.[22]

---

[19] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.

[20] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[21] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[22] Ari Lazarus (consumer education specialist, FTC), *How fast will identity thieves use stolen info?*, Military Consumer (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

56.     Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information *may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[23]

57.     For instance, with a stolen social security number, which is part of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[24]

58.     The ramifications of Defendant's failure to keep its Class Members' PII secure are long lasting and severe. Once that information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for up to six (6) to twelve (12) months or even longer.

59.     Further, criminals often trade stolen PII on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PII on the internet, thereby making such information publicly available.

---

[23] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* GAO, June 4, 2007, https://www.gao.gov/assets/gao-07-737.pdf

[24] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 15, 2017, https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/

60.    Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened. [25] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent (40%) of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[26]

61.    Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.

62.    Defendant's offer of two years of identity monitoring and protection services to Plaintiff and the Class is woefully inadequate and will not fully protect them from the damages and harm caused by Defendant's cybersecurity failures. While some harm has begun already, the full scope of the harm has yet to be realized. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. Once the twenty-four months have expired, Plaintiff and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Defendant's negligence. Furthermore, identity monitoring only alerts someone to the fact that they have *already been the victim of identity theft* (*i.e.*, fraudulent acquisition and use of another person's PII)—it does not

---

[25] *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2.

[26] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

prevent identity theft.[27]   Nor can an identity monitoring service remove personal information from the dark web.[28]  "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[29]

63.    As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from continued fraud and identity theft. Plaintiff and Class Members must now take the time and effort to mitigate the actual and potential impact of the Data Breach in their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Even more seriously is the identity restoration that Plaintiff and other Class Members must go through, which can include spending countless hours filing police reports, filling out IRS forms, Federal Trade Commission checklists, Department of Motor Vehicle driver's license replacement applications, and calling financial institutions to

---

[27] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html

[28] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[29] *Id.*

cancel fraudulent credit applications, to name just a few of the steps Plaintiff and Class Members must take.

64.     Plaintiff and Class Members have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

a.      Trespass, damage to, and theft of their personal property including PII/PHI;

b.      Improper disclosure of their Private Information;

c.      The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

d.      Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their Private Information and that identity thieves may use that information to defraud other victims of the Data Breach;

e.      Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach; and

f.      Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' personal information for which there is a well-established and quantifiable national and international market.

65.     Moreover, Plaintiff and Class Members have an interest in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown themselves wholly incapable of protecting Plaintiff's and Class Members' Private Information.

66.     Radius acknowledged the harm caused by the Data Breach because it offered Plaintiff and Class Members the woefully inadequate twenty-four months of identity monitoring and protection services. Twenty-four months of identity monitoring and protection services is, however, inadequate to protect Plaintiff and Class Members from a lifetime of identity theft risk.[30]

67.     Defendant further acknowledged, in its letter to Plaintiff and other Class Members, that Radius needed to improve its security protocols, stating: "[w]e continue to implement necessary patching and measures to secure the MOVEit database as we learn of new information."[31]

68.     The Breach Notice further acknowledged that the Data Breach would cause inconvenience to affected individuals and that financial harm would likely occur, stating: "We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing account statements and monitoring free credit reports for suspicious activity and

---

[30] *See* **Exhibit 1**, attached hereto.

[31] *Id.*

errors."[32]

69.    At Defendant's suggestion, Plaintiff and Class Members are desperately trying to mitigate the damage that Defendant's Data Breach has caused them.  Given the kind of Private Information Defendant made accessible to hackers by utilizing the inadequately protected MOVEit software, Plaintiff and Class Members are certain to incur additional damages. Because identity thieves have their PII and PHI, Plaintiff and Class Members will need to have identity monitoring and protection services for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[33]

70.    None of this should have happened.

**C.    Defendant Was Aware of the Risk of Cyber Attacks**

71.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[34] Yahoo,[35] Marriott

---

[32] *Id.*

[33] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

[34] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[35] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-

International,[36] Chipotle, Chili's, Arby's,[37] and others.[38]

72.     Defendant, who provides accounts receivable and customer relations management services to companies throughout the United States requiring the collection and maintenance of highly sensitive and valuable PII and PHI, should certainly have been aware, and indeed was aware, that failing to ensure the MOVEit software employed minimum basic security precautions created a substantial risk for a data breach that could expose the Private Information it collected and maintained.

73.     With the increasing prevalence of data breach announcements, Defendant certainly recognized it had a duty to use reasonable measures to protect the wealth of PII and PHI it collected and maintained.

74.     In 2022, a total of 1,802 data breaches occurred, which represents the second highest number of data events in a single year and just 60 events short of the all-time record of 1,862 in 2021.[39]

---

russian-hack-of-yahoo-how-they-did-it.html.

[36] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019),  https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[37] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[38] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[39] ITRC_2022-Data-Breach-Report_Final-1.pdf (idtheftcenter.org)

75.    In light of the significant number of data breaches that occurred in 2022, Defendant knew or should have known that its customers' Private Information would be targeted by cybercriminals.

76.    Defendant was clearly aware of the risks it was taking when it failed to ensure the MOVEit software provided sufficient cybersecurity protection and the harm that could result from inadequate data security.

### D.    Defendant Could Have Prevented the Breach

77.    Data breaches are preventable.[40] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[41] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[42]

78.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[43]

---

[40] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[41]*Id.* at 17.

[42]*Id.* at 28.

[43]*Id.*

79.    In a Data Breach like this, many failures laid the groundwork for the Breach. The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[44] The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

80.    Upon information and belief, Defendant failed to ensure that the MOVEit software maintained reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines.  Upon information and belief, Defendant also failed to ensure that the MOVEit software met the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program

---

[44] FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

(FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity preparation.

81.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[45]

82.    To prevent and detect cyber-attacks, including the attack that resulted in the Data Breach, Defendant could and should have implemented, or ensured that PSC implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

---

[45] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[46]

83.    Further, to prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, or ensured

---

[46] *Id.* at 3-4.

PSC implemented, as recommended by the United States Cybersecurity & Infrastructure

Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[47]

84.    In addition, to prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, or ensured that PSC implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

  - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- **Apply principle of least-privilege**

  - Monitor for adversarial activities
  - Hunt for brute force attempts

---

[47] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/protecting-against-ransomware

- Monitor for cleanup of Event Logs
- Analyze logon events

- **Harden infrastructure**

    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[48]

85. Given that Defendant utilized the MOVEit transfer tool, which stored the Private Information of thousands of individuals, including Plaintiff and the Class Members, Defendant could and should have ensured that the MOVEit software was capable of preventing and detecting cyber-security attacks.

86. To prevent zero-day attacks, Defendant could and should have implemented, or ensured PSC implemented, as recommended by Security Intelligence, the following:

- **Patch management:** Formal patch management can help security teams remain aware of critical patches.

- **Vulnerability management:** Vulnerability assessments and penetration tests can help companies detect zero-day vulnerabilities before adversaries find them.

- **Attack surface management (ASM):** ASM enables security teams to identify all network assets and scan them for vulnerabilities. ASM tools assess the network from an attacker's perspective, focusing on how threat actors might try to exploit assets.

- **Threat intelligence:** Security researchers are often the first to identify

---

[48] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

zeroday vulnerabilities. Organizations that receive threat intelligence updates may be informed about zero-day vulnerabilities sooner.

- **Anomaly-based detection methods**: Machine learning tools can spot suspicious activity in real-time. Common anomaly-based detection solutions include user and entity behavior analytics (UEBA), extended detection and response (XDR) platforms, endpoint detection and response (EDR) tools and some intrusion detection and intrusion prevention systems.[49]

87.    Defendant acquired, collected, and stored the Private Information of Plaintiff and Class Members.

88.    Plaintiff and other Members of the Class entrusted their Private Information to Defendant.

89.    By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII/PHI from disclosure.

90.    Given that Defendant was storing the Private Information of other individuals, Defendant could and should have implemented all of the above measures, and ensured that PSC did the same, to prevent and detect cyber-security attacks.

91.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiff and Class Members.

---

[49] *See* Jonathan Reed, *The MOVEit breach impact and fallout: How can you respond?*, July 19, 2023, The MOVEit breach impact and fallout: How can you respond? (securityintelligence.com).

92.    Defendant could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the Private Information of Plaintiff and Class Members and ensuring the MOVEit software properly secured and encrypted the folders, files, and/or data fields containing the Private Information of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an Internet accessible environment when there was a reasonable need to do so.

93.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

94.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### E.    Defendant's Response to the Data Breach is Inadequate to Protect Plaintiff and the Class

95.    Defendant failed to inform Plaintiff and Class Members of the Data Breach in time for them to protect themselves from identity theft.

96.    Defendant stated that "[o]n June 1, 2023, Radius learned of a vulnerability in the MOVEit web transfer application that Radius, along with several thousand other companies and government agencies, utilizes for transferring documents."[50] Despite the

---

[50] *See* **Exhibit 1**

public notices published by PSC, and Defendant's awareness of its use of PSC's MOVEit tool, Radius did not begin notifying the Plaintiff and Class Members until August 9, 2023—over two (2) months after knowledge of the breach.

97.    During these intervals, the cybercriminals had the opportunity to exploit the Plaintiff and Class Members' Private Information while Defendant was sitting idle and secretly still investigating the Data Breach.

### F.    Defendant Failed to Comply with FTC Guidelines

98.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

99.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[51] The guidelines also recommend businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large

---

[51] https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf

amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

100.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

101.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

102.    Defendant was always fully aware of their obligations to protect the Private Information of Plaintiff and Class Members and the significant repercussions that would result from its failure to ensure the MOVEit software had adequate data security.

### G.    Radius Failed to Adhere to HIPAA

103.    HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected

health information.[52]

104.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.[53]

105.    The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a.    Failing to ensure the MOVEit software was capable of maintaining the confidentiality and integrity of electronic PHI that is creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

b.    Failing to ensure the MOVEit software was capable of protecting against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. §164.306(a)(2);

c.    Failing to ensure that the MOVEit software was capable of protecting against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

---

[52] HIPAA lists 18 types of information that qualifies as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[53] *See* 45 C.F.R. § 164.306 (Security standards and General Rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

d.  Failing to comply with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. §164.306(a)(4);

e.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

f.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

g.  Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

h.  Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308; and

i.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. §164.530(c).

## CLASS ACTION ALLEGATIONS

106.    Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

107.    Plaintiff brings this action against Defendant on behalf of themselves and all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiff asserts all claims on behalf of a nationwide class (the "Class") defined as follows:

> All natural persons residing in the United States who received a Notice of Data Breach letter from Defendant.

108.    Excluded from the Class is the Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

109.    Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

110.    The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

111.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. According to the U.S. Department of Health and Human Services Office for Civil Rights Data Breach Portal, the total number of persons affected by the Data Breach is approximately 600,794.

112. **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Defendant's uniform misconduct. All had their PII and PHI compromised as a result of the Data Breach.

113. **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and their counsel.

114. **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

115. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those

questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a.      When Defendant actually learned of the Data Breach and whether its response was adequate;

b.      Whether Defendant failed to adequately safeguard Plaintiff's and Class Members' Private Information ;

c.      Whether Defendant owed a duty to Plaintiff and the Class to ensure the MOVEit software was capable of adequately protecting their Private Information, and whether it breached this duty;

d.      Whether Defendant breached its duties to Plaintiff and the Class as a result of the Data Breach;

e.      Whether Defendant failed to ensure the MOVEit software provided adequate data security;

f.      Whether Defendant knew or should have known the MOVEit software and network security systems were vulnerable to cyber-attacks;

g.      Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its company network;

h.      Whether Defendant was negligent in utilizing the MOVEit software, which permitted unencrypted PII and PHI of vast numbers of individuals to be stored within its network;

i.      Whether Defendant was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach;

j.      Whether Defendant breached implied contractual duties to Plaintiff and Class Members to use reasonable care in protecting their PII and PHI;

k.      Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

l.      Whether Defendant continues to breach duties to Plaintiff and Class Members;

m.     Whether Plaintiff and the Class suffered injury as a proximate result of Defendant's negligent actions or failures to act;

n.      Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

o.      Whether Defendant's actions alleged herein constitute gross negligence, and whether Plaintiff and Class Members are entitled to punitive damages.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

116.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

117.    While providing, customer engagement and technology services on behalf of companies, Radius gathered and stored the Private Information of Plaintiff and Class Members.

118.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information. Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between the Defendant and the Plaintiff and Class Members.

119.    Defendant was well aware of the fact that cyber criminals routinely target corporations through cyberattacks in an attempt to steal the Private Information of employees, applicants, business associates, customers, and patients.

120.    Defendant owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing personal information, including taking action to

reasonably safeguard such data and provide notification to Plaintiff and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

121.    Defendant had duties to protect and safeguard the Private Information of Plaintiff and Class Members from potential cyberattacks, including by ensuring the MOVEit software: (i) encrypted any document or report containing PII or PHI, (ii) did not permit documents containing unencrypted PII or PHI to be maintained on its systems, and (iii) took other similarly common-sense precautions when dealing with sensitive PII or PHI. Additional duties that Defendant owed Plaintiff and Class Members include ensuring the MOVEit software:

    a.    Exercised reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PII and PHI in its possession;

    b.    Protected the PII and PHI in its possession using reasonable and adequate security procedures and systems;

    c.    Adequately and properly audited and tested its systems;

    d.    Did not store PII and PHI for longer than absolutely necessary;

    e.    Implement processes to quickly detect a data breach, security incident, or intrusion; and

    f.    Promptly notify Plaintiff and Class Members of any data breach, security incident, or intrusion that affected or may have affected their PII or PHI.

122. Plaintiff and Class Members were the intended beneficiaries of Defendant's duties, creating a special relationship between them. Defendant was in a position to ensure that the MOVEit software was sufficient to protect the Private Information that Plaintiff and the Class had entrusted to Defendant.

123. Defendant breached its duties of care by failing to adequately protect Plaintiff's and Class Members' Private Information. Defendant breached its duties by, among other things:

    a.    Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the PII and PHI in its possession;

    b.    Failing to ensure the MOVEit software was capable of protecting the PII and PHI in its possession using reasonable and adequate security procedures and systems;

    c.    Failing to ensure the MOVEit software was adequately and properly auditing and testing its computer systems to avoid cyberattacks;

    d.    Failing to ensure the MOVEit software adequately and properly audited, tested, and trained its employees regarding how to properly and securely transmit and store PII and PHI, including maintaining PII and PHI in an encrypted format;

    e.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

     f.     Failing to abide by reasonable retention and destruction policies for PII and PHI of former customers and patients; and

     g.     Failing to promptly and accurately notify Plaintiff and Class Members of the Data Breach that affected their Private Information.

124.   Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

125.   As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiff and Class Members have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

126.   The damages Plaintiff and Class Members have suffered (as alleged above) were and are reasonably foreseeable.

127.   The damages Plaintiff and the Class have and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

128.   Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

129.   Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

130.   Plaintiff's and Class Members' Private Information was provided to Defendant as a condition of their receipt of customer engagement and technology services.

131.    When Plaintiff and Class Members provided their Private Information to Defendant as part of their receipt of services, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their Private Information and to timely notify them in the event of a Data Breach.

132.    Based on Defendant's legal obligations and acceptance of Plaintiff's and Class Members' PII and PHI, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards.

133.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' Private Information and failing to provide them with timely and accurate notice of the Data Breach.  Indeed, it took Defendant over a month to begin warning Plaintiff and Class Members of their imminent risk of identity theft.

134.    As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and the Class Members have suffered damages, including foreseeable consequential damages that Defendant knew about when it requested Plaintiff's and the Class Members' Private Information.

135.    Plaintiff and the Class have suffered injury, and are entitled to actual and punitive damages, statutory damages, and reasonable attorneys' fees and costs, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

136.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

137. Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant had a duty to Plaintiff and the Class to ensure the MOVEit software included adequate data security to safeguard the PHI and PII of Plaintiff and the Class.

138. Defendant is a covered entity under HIPAA, 45 C.F.R. §160.102, and as such are required to comply with the HIPAA's Privacy Rule and Security Rule. HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

139. HIPAA further requires Defendant to disclose the unauthorized access and theft of the protected health information of Plaintiff and the Class "without unreasonable delay" so that Plaintiff and Class Members could take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their personal information. *See* 45 C.F.R. §§ 164.404, 164.406, and 164.410.

140. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PHI and PII. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

141.    Defendant gathered and stored the PHI and PII of Plaintiff and the Class as part of their business of soliciting their services to their clients and their clients' patients, which solicitations and services affect commerce.

142.    Defendant violated the FTC Act by failing to use reasonable measures to protect the PHI and PII of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

143.    Defendant breached their duties to Plaintiff and the Class under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiff's and Class Members' PHI and PII, and by failing to provide prompt notice without reasonable delay.

144.    Defendant's multiple failures to comply with applicable laws and regulations constitutes negligence *per se*.

145.    Plaintiff and the Class are within the class of persons that HIPAA and the FTC Act were intended to protect.

146.    The harm that occurred as a result of the Data Breach is the type of harm HIPAA and the FTC Act were intended to guard against.

147.    Defendant breached their duties to Plaintiff and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and the Class's PHI and PII.

148.    Defendant breached their duties to Plaintiff and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiff and the Class.

149.    Defendant's violation of the FTC Act and HIPAA constitutes negligence *per se*.

150.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

151.    The injury and harm that Plaintiff and Class members suffered (as alleged above) was the direct and proximate result of Defendant's negligence *per se*.

152.    Plaintiff and the Class have suffered injury and are entitled to damages in amounts to be proven at trial.

### FOURTH CAUSE OF ACTION
### INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

153.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

154.    Plaintiff and Class Members have a reasonable expectation of privacy in their Private Information.

155.    Defendant's negligent, reckless, and intentional conduct as alleged herein invaded Plaintiff's and Class Members' privacy.

156.    By knowingly failing to keep Plaintiff's and Class Members' Private Information safe, and by knowingly misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant negligently, recklessly, and intentionally invaded Plaintiff's and Class Members' privacy by intruding into Plaintiff's and Class Members' private affairs, without approval, in a manner that identifies Plaintiff

and Class Members and that would be highly offensive and objectionable to a person of ordinary sensibilities.

157. Defendant knew that an ordinary person in Plaintiff's or a Class Member's position would consider Defendant's negligent, reckless, and intentional actions highly offensive and objectionable.

158. Such an intrusion into Plaintiff's and Class Members' private affairs is likely to cause outrage, shame, and mental suffering because the Private Information disclosed contained PII and PHI.

159. Defendant invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private life by negligently, recklessly, and intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

160. The Private Information disclosed by Defendant has no legitimate reason to be known by the public.

161. Defendant intentionally concealed from Plaintiff and Class Members an incident that misused and/or disclosed their Private Information without their informed, voluntary, affirmative, and clear consent.

162. As a proximate result of such intentional misuse and disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct, amounting to a substantial and serious invasion of Plaintiff's and Class Members' protected privacy interests causing anguish and suffering such that a person with ordinary sensibilities would consider

Defendant's intentional actions or inaction highly offensive and objectionable.

163.   In failing to protect Plaintiff's and Class Members' Private Information, and in negligently, recklessly, and intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff's and Class Members' rights to have such information kept confidential and private. Plaintiff, therefore, seeks an award of damages on behalf of himself and the Class.

**FIFTH CAUSE OF ACTION**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
<u>**(On Behalf of Plaintiff and the Class)**</u>

164.   Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

165.   As described above, when Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts in which Defendant agreed to comply with their statutory and common law duties and industry standards to protect Plaintiff's and Class Members' Private Information and timely detect and notify them in the event of a data breach.

166.   These exchanges constituted an agreement between the parties: Plaintiff and Class Members were required to provide their Private Information to Defendant in exchange for customer engagement and technology services.

167.   It was clear by these exchanges that the parties intended to enter into an agreement. Plaintiff and Class Members would not have voluntarily disclosed their Private Information to Defendant but for the prospect of Defendant's promise of providing

customer engagement and technology services. Conversely, Defendant presumably would not have received Plaintiff's and Class Members' Private Information if it did not intend to provide its services.

168.    Implied in these exchanges was a promise by Defendant to ensure the Plaintiff's and Class Members' Private Information was only used to provide customer engagement and technology services from Defendant.

169.    Plaintiff and Class Members therefore did not receive the benefit of the bargain with Defendant, because they provided their Private Information in exchange for Defendant's implied agreement to keep it safe and secure.

170.    While Defendant had discretion in the specifics of how they met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

171.    Defendant breached this implied covenant when they engaged in acts and/or omissions that are declared unfair trade practices by the FTC. These acts and omissions included: failing to protect Plaintiff's and Class members' Private Information, failing to ensure the MOVEit software had adequate data security protection, and failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

172.    Plaintiff and Class Members did all or substantially all the significant things that the contract required them to do. All conditions required for Defendant's performance were met.

173.    Defendant's acts or omissions unfairly interfered with Plaintiff's and Class Members' rights to receive the full benefit of their contracts.

174.    Plaintiff and Class Members have been or will be harmed by Defendant's breach of this implied covenant in the many ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cyber

criminals have obtained their Private Information, and the attendant long-term expense of attempting to mitigate and insure against these risks.

175.    Defendant is liable for their breaches of these implied covenants, whether or not they are found to have breached any specific express contractual term.

176.    Plaintiff and Class Members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

### SIXTH CAUSE OF ACTION
### BREACH OF CONFIDENTIALITY
### (On Behalf of Plaintiff and the Class)

177.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

178.    At all times during Plaintiff's and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' Private Information.

179.    Plaintiff's and Class Members' Private Information constitutes confidential and novel information. Indeed, Plaintiff's and Class Members' Social Security numbers can be changed only with great difficulty and time spent, which still enables a threat actor to exploit that information during the interim; additionally, an individual cannot obtain a

new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

180.   As alleged herein and above, Defendant's relationships with Plaintiff and Class Members were governed by terms and expectations that Plaintiff's and Class members' Private Information would be collected, stored, and protected in confidentiality, and would not be disclosed to unauthorized third parties.

181.   Plaintiff and Class Members provided their respective Protected Information to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the Private Information to be disseminated to any unauthorized parties.

182.   Defendant voluntarily received in confidentiality Plaintiff's and Class Members' Private Information with the understanding that the Private Information would not be disclosed or disseminated to the public or any unauthorized third parties.

183.   Due to Defendant's failure to ensure the MOVEit software was capable of preventing, detecting, and avoiding the Data Breach from occurring by, *inter alia*, not following best information security practices and by not providing proper training to secure Plaintiff's and Class Members' Private Information, Plaintiff's and Class Members' Private Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

184.   As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiff and Class Members have suffered damages.

185.    But for Defendant's disclosure of Plaintiff's and Class Members' Private Information through its unsecured system in violation of the parties' understanding of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' Private Information, as well as the resulting damages.

186.    This disclosure of Plaintiff's and Class Members' Private Information constituted a violation of Plaintiff's and Class Members' understanding that Defendant would safeguard and protect the confidential and novel Private Information that Plaintiff and Class Members were required to disclose to Defendant.

187.    The concrete injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and Class Members' Private Information. Defendant knew or should have known that the MOVEit software's data security measures had numerous security and other vulnerabilities that placed Plaintiff's and Class Members' Private Information in jeopardy.

188.    As a direct and proximate result of Defendant's breaches of confidentiality, Plaintiff and Class Members have suffered and/or are at a substantial risk of suffering concrete injury that includes but is not limited to: (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII/PHI; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII/PHI; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and

future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII/PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information under its continued control; and (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

### SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

189.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

190.    Plaintiff and Class Members conferred a monetary benefit on Defendant by providing Defendant with their valuable Personal Information.

191.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

192.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

193.    Under the principles of equity and good conscience, Defendant should not be

permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

194. Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

195. If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their PII and PHI to Defendant.

196. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised

as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

197.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

198.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**EIGHTH CAUSE OF ACTION**
**Injunctive and Declaratory Relief**
**(On Behalf of Plaintiff and the Class)**

199.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

200.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201

201.    As previously alleged and pleaded, Defendant owes duties of care to Plaintiff and Class Members that require them to adequately secure their Private Information.

202.    Defendant still possesses the Private Information of Plaintiff and the Class Members.

203.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the Class Members.

204.    Defendant has claimed that it is taking some steps to increase its data security, but there is nothing to prevent Defendant from reversing these changes once it has weathered the increased public attention resulting from this Breach, and to once again

place profits above protection.

205.    Plaintiff, therefore, seeks a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a.    Ordering Defendant to ensure third-parties possessing its customers' PII and PHI engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.    Ordering Defendant to significantly increase its spending on cybersecurity including systems and personnel;

c.    Ordering Defendant to engage third-party security auditors and internal personnel to run automated security monitoring;

d.    Ordering that Defendant guarantee third-parties possessing its customers PII and PHI audit, test, and train their security personnel regarding any new or modified procedures;

e.    Ordering that Defendant protect Plaintiff's and the Class's Private Information by, among other things, guaranteeing third-parties possessing its customers' PII and PHI have firewalls and access

controls so that if one area of the third-parties' system is compromised, hackers cannot gain access to other portions of its systems;

f.  Ordering that Defendant cease storing unencrypted Private Information on its systems;

g.  Ordering that Defendant ensure that third-parties possessing its patients' Private Information conduct regular database scanning and securing checks;

h.  Ordering Defendant to ensure third-parties in possession of its customers' Private Information routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

i.  Ordering Defendant to implement and enforce adequate retention policies for Private Information, including destroying, in a reasonably secure manner, PII and PHI once it is no longer necessary for it to be retained; and

j.  Ordering Defendant to meaningfully educate its current, former, and prospective employees and subcontractors about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps they must take to protect themselves.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII and PHI of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.    For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses and as further allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Dated: August 29, 2023                    Respectfully Submitted,

_/s/ Brian C. Gudmundson_
Brian C. Gudmundson (MN Lic. #336695)
Michael J. Laird (MN Lic. #398436)
Rachel K. Tack (MN Lic. #399529)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
june.hoidal@zimmreed.com
michael.laird@zimmreed.com
rachel.tack@zimmreed.com

William B. Federman (_pro hac vice forthcoming_)
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
-and-
212 W. Spring Valley Road
Richardson, TX  75081
Email: WBF@federmanlaw.com

_Counsel for Plaintiff & the Class Proposed Class_